Your Honor, this is the first case of the morning. Call 209-856-People of the State of Illinois v. Christina Beltran. On behalf of the Avalanche, Mr. Darren Noda. On behalf of the Avalanche, Mr. Jay Walker. Good morning, Mr. Miller. Excuse me. May it please the Court. So, Darren Miller on behalf of Christina Beltran. Your Honor, as you know, Ms. Beltran stands convicted of murder of her five-year-old daughter. And essentially, we've raised two arguments on appeal. First, that her conviction should be reversed because statements were taken against her and used against her in trial in violation of Miranda. And secondly, because the State engaged in repeated inflammatory argument during its closing argument. I intend to... If you can, can you try to keep your voice up a little bit? I'm sorry, Your Honor. I intend really to focus mostly on the Miranda issue, unless Your Honors would like me to also discuss the issue regarding the closing argument. Well, I have a question regarding that. You urge us to follow the Efland case versus Colorado. That is where the court found defendant was in custody in a hospital setting. Now, you acknowledge that it does, just since it's out of state, provide guidance. But if the facts are distinguishable, and opposing counsel really sets out a number of them that are very different, then why should we follow that case? Why should we use it as guidance? There were three justices that dissented in that case. Your Honor, I didn't really cite that case as mandating that you should necessarily follow it. No, I understand, but you said it provides good guidance. What about it if the facts are so different? The way that I meant that it provides guidance is that I think a lot of Illinois cases, including this court, have been reluctant to hold that an interrogation inside a hospital is custodial. So I cited Efland to show that under some circumstances, depending on the facts of the case, that indeed an interrogation at a hospital can be custodial. And of course, part of my argument is that all these cases are going to be fact-specific. You're never going to find two cases with identical facts, or if you did, it would be completely random. All right, well, in this case, while there were four officers in the room, only two of them questioned her, correct? Correct, but they're in the presence of four officers. So four officers appeared with video equipment. And I think what is crucial here as far as probably the most important factor as far as whether a reasonable person would believe they were in custody is they appeared not only with video equipment, not only did they record this, which would show that it's not merely a routine questioning, but they appeared with a warrant to search her hands and, I believe, clothing. And they presented her with this warrant at the start before the questioning, and they told her that they had the warrant. But rather than executing the warrant right there and then, the officers waited until after the interrogation. You're talking about the July 7th interview? Yes, the hospital bedside interview. And so I submit that no reasonable person could feel that they're free to leave, if she were even able to leave, or to basically put an end to this before the officers had even executed the warrant. So I think that's a crucial factor in this case. The officer also told her that she didn't have to talk to them at that time, correct? I'm sorry? The officer also told her at that time that she did not have to talk to them. Right, and that happened in Evelyn, too. So that is one factor. There are, well, if I can go back as to what preceded all this, Ms. Beltran was in the hospital with her daughter, brought her daughter to the hospital, learned her daughter died. So her reaction to this was a complete psychotic breakdown. She thought that she was in Mexico. She thought that she was 15 years old, and I believe she was 23 years old at the time of trial. She believed that she was pregnant and was attending a fair. She wasn't pregnant. Right, but then she was administered Haldol to calm her down and to deal with the psychotic breakdown. Right, she had a suicide attempt, so eventually at 9 p.m. they injected her with 5 milligrams of Haldol, which I believe one of the experts testified was a hefty dose. About eight hours and 45 minutes later, at 5.45 in the morning, four officers appear at her bedside, video camera, audio equipment, recording, search warrant. And does the record indicate she was coherent? The record indicates she was awake. The record indicates that the Haldol still remained in her system. I believe the half-life of Haldol is... According to Dr. Mason. Well, according to, I believe to all the doctors that at least the Haldol is in her system because I don't believe that it's controverted that the half-life of Haldol is 16 hours.  Right, to the extent that the Haldol was influencing her. I mean, I would presume that given that it was a Haldol that calmed her down, that she was still under the influence that one of the experts testified to that effect. That's a bachelor determination that we have to give great deference to the trial court. The trial court saw these two experts testify and chose to believe Dr. Wassilor as opposed to Dr. Masson or Mason, correct? Right, that's correct. Yeah, there is a deference standard here, and I acknowledge that. But there are... If I could go over some of the factors that I think are pertinent as to why a reasonable person, and I think I've already hit on some of them, but you look, it's early hours. One of the factors that courts look at is location, time, length, mood, and mode of the interrogation. So you look at that here. It was early morning. It was 545 in the morning. However, she was up, correct? The record reflects she was up. She wasn't sleeping when they walked in. Right, it's not really clear when she woke up or how she woke up. The hospital staff woke her up, but she was, obviously she was awake. She was talking with them. Although the record and the videotape that you watch, it clearly shows that she was yawning throughout the entire discussion. And I really can't emphasize enough, this is less than a day and about eight hours after she had a complete psychotic breakdown. And that is a huge factor, I believe, here. So also regarding... I mean, stopping on that, when you say that's a huge factor, what do you mean by that, counsel? Because what does the record indicate, then, the effects, I mean, of that psychotic break were in the morning, that she was still evidencing? She wasn't crying during the interview, was she? Was she crying? No, she was not crying. She was able to answer the questions of the officers? Correct. So she appeared to understand what they asked her, correct? Correct. Okay. So what are you asserting are the effects that she still exhibited or had from this psychotic break? Are you relying on the Braggs case? I'm sorry? Are you relying on the Braggs case? If you could refresh my recollection. The Braggs case is the case where the investigating officer was aware of the circumstances, characteristics, or the traits of the individual. I think they may have had some type of a breakdown in that case as well. Yes. And one of the factors that you look at is also the age, intelligence, and mental makeup of the accused. She's got a 79 IQ, a second-grade education. She didn't speak English. There's absolutely no evidence that she's ever been in any trouble here or has any familiarity with the legal system. And, again, on that point, you have two doctors both give you different opinions with respect to the IQ, correct? Yeah, well, I believe that the doctor who actually tested her said her IQ was 79. I believe they both agreed that, if my recollection is correct, that she was not average intelligence. And, yeah, there were certain things that the experts disagreed with, but her second-grade education is not in dispute. The fact that she's from another country is not in dispute. The fact that she's not familiar with this legal system is there's no evidence that she had any familiarity with that. Another factor is the presence or absence of the accused family or friends. There were no friends, no family there. But nobody was there. It's not like they excluded family or friends, correct? Right, but no one was there for support. I'm not saying the police intentionally excluded, although I guess the argument could be made that by appearing at 545 in the morning that that would decrease the likelihood that friends or family would be there. Another factor that goes to whether the defendant was in custody is the number of officers present. And, again, there were four officers there, which indicates much more than just a routine questioning. And the fact that this was recorded and videotaped, I believe, also shows that this was more than just a routine questioning and indication that would lead a reasonable person to believe when officers enter a room with audio and video equipment that you've got to stay. And yet another factor is when right before the interview even started, Ms. Beltran asked if she could use the bathroom. And the officer said, well, you know, if it's an emergency, you can use it, which would lead a person to believe that you need to get the officer's permission in order to even use the bathroom, which is another indicator that a reasonable person would believe that they were not free to leave. So I think when you take all these factors and you put them together, and especially, again, the critical factor is the search warrant. And when you serve a warrant on someone and say, hey, we're here to search you, and then you start asking them questions, well, who in their right mind would feel they're free to leave? You can't leave until that warrant's executed. And I believe part of the warrant was to photograph her hands, so she knew that she had her name until her hands were photographed. So any reasonable person would feel they were in custody at that point. And that's you're talking about July 7th. Correct. We just discussed. Correct. How about the July 13th interview? Well, I mean, it kind of ties together because you got the question first, Mirandize later issue that goes both to the July 7th and to the July 13th interview. And that's Siebert from the U.S. Supreme Court and Lopez from our Illinois Supreme Court, which kind of limited Siebert. But basically, the cases have held that it's improper for police officers to deliberately employ a method whereby they have a strategy to question someone, get inculpatory statements, and then issue the Mirandize. And essentially the theory is that if you are going to get inculpatory statements, it kind of renders the Mirandize meaningless. You give the Mirandize up front. You don't give them after you've already obtained the inculpatory statements. And under Lopez, the record should reflect that it's deliberate, that it's a deliberate strategy by the officers. And I think if you look at what happened here, it was deliberate. Well, you're saying that that was what was employed on July 7th. Correct. But July 13th is six days later, different location. There were written Miranda warnings given. Why wasn't any taint attenuated by that date, by that second occasion, July 13th? Well, first of all, I think it's reasonable. If you're going to assume that the entire July 7th interview violated Miranda, then for the July 13th interview, it was essentially futile. I mean, there's really no point at that point for her to change her story. She already gave a 45-minute confession at hospital bedside. And secondly, one of the issues that goes to the question first, Mirandize later, that makes it improper is whether you're told by the officers that the improper statements would not be used against her. And she was never informed of anything like that. In fact, Holguin did the opposite. He, on July 13th, when he, when they re-Mirandized her, he minimized the importance of Miranda. And let me see if I can find the quote here. I think he said that he, that Miranda rights didn't really mean anything. Yeah. They quote, it, the Miranda rights, doesn't mean anything, just like I read them to you at the hospital. So not only is he telling them that they didn't mean anything back then, which I think he's right. He's also telling them they don't mean anything right there. So I think they're, and not to mention the fact that they, the officers picked her up from the hospital. She was never out of custody. And they brought her in arguably in a more custodial type situation because they took her from the hospital to the police station or child advocacy center. Well, custody is not an issue.  Right. But the issue is Miranda and the effect of maybe the statement, correct? Right. But I'm just saying how the technique basically carried over. Did you find any cases that have a particular holding that the notice of a search warrant, dependency of a search warrant, is dispositive in determining custody? Dispositive? Yeah. No. No. Did you find anything at all that that's a factor in determining custody? No. But, I mean, logic. I understand. I just was wondering if there were any cases. To my knowledge. I mean, I'm not saying there's nothing out there, but I didn't come across anything. Counsel, you'll have time on rebuttal. Okay. Thank you. Mr. Hoffman. May it please the court, counsel. I am Jay Hoffman of the Office of the Illinois State's Attorney's Appellate Prosecutor. In this case, once again, it's my pleasure to be before this honorable court representing the people of the state of Illinois. As counsel has done, unless there are specific questions, I will not deal with the second issue, that of the prosecutorial argument, allegation, except to say that it should be remembered that that matter is forfeited. And, therefore, it's a plain air interpretation. Under that interpretation, of course, counsel is not alleged that the first prong of a plain air analysis that the facts are close. And the second issue, of course, is whether the fairness of the trial was so impacted that it compromised the integrity of the judicial procedure. Well, couldn't we argue that when this prosecutor made repeated, repeated statements about that angel shirt? I mean, she's in heaven now. She's where she should be. And, you know, they said it continuously. They said it in opening. They said it in closing. They said it in rebuttal. I mean, didn't they have enough facts to win the case without having to continue to harp on the angel shirt? Well, it could be in retrospect they would wish that they had not done that. But whether or not on Monday morning we decide we should have thrown that pass or run the ball is not the question. The question is the impact it has on the jury. How about the alleged crime? The people allege, Your Honor, that the record clearly shows that there was no crime. What happened was the defense attorney said, well, let the record show that the prosecutor is crying, perhaps crying before the jury. The prosecutor then said, oh, give me a break. I think that can be interpreted to say that's not what's going on. Counsel says, well, we don't know that. That's true. There's an inference to that. But didn't somebody say something like highly emotional? More importantly, yes, Your Honor, that's what I'm saying. It's clear. I think the clear reading of the record is that the prosecutor was not crying because after that exchange and after the defense attorney clearly says she's crying, the judge says, let the record show she was using an emotional voice. Now, if the trial judge took the time to do that, I believe we have to say that he accurately analyzed what was going on. And if the prosecutor was crying, he would have said that she's crying and did not. Is there any writing on the front of the shirt that the prosecutor used to hold up? Yes, Your Honor. And the jury saw that shirt. It said heavenly angels, all stars. And that's where the reference to the heavenly angels came to. And my reply to you is saying, well, perhaps they should know, but that doesn't mean you remember that the analysis is whether the comments in and of themselves solely had no other reason than to go to an emotional argument to the jury. That's not the case here. They had those facts in front of them. And with regard to saying, well, perhaps they're not totally relevant, I would note that those facts, that argument, doesn't go to the prosecutor's, the state's argument as opposed to the defendant's argument here. Remember, the defendant's argument was, yes, someone beat this child to death. But, and for the first time at trial, she says, it wasn't me. It was my live-in boyfriend, Victor, who did it. But she was the only one on trial. Well, yes, she was, but they advanced that argument, Your Honor. What I'm saying is, taken for what it is and for the argument, what the argument says is, this 5-year-old child did not deserve to die. And that goes to whether or not the defendant beat her to death or Victor beat her to death. But when they say Evelyn is now that heavenly angel, she's free. She's free from the hands of her mother. She's free from the anticipation of the abuse, which is arguably more horrific than the abuse can be itself. And to not hold her responsible would be a grave injustice. And that should be taken in context of, again, they have a right to refer to the evidence and to refer, to rebut the defendant's arguments. What they were saying here is, yes, she was taken too early. And contrary to defendant's argument, it was, I'm sorry, to Victor's argument, yeah, to defendant's argument, it was not Victor who did it. It was the defendant. And they followed up and interspersed. And, of course, we have to take the arguments as a whole. It was interspersed with evidence that she had admitted she said she wanted an abortion. She should have never had the child. She hated the child. She treated the young girl child differently than she treated her twin boys. She wished the child were dead. And so those are factors that tie in in why that argument was proper. On another matter, with regard to whether or not she was in custody when she was in the hospital room, do you agree with Mr. Miller with respect to the fact that the officers presented a search warrant and that is a factor that should be considered as to whether she felt she could leave or not? Well, the totality of the circumstances must be considered, Your Honors. There's no doubt about that. That's one factor. I'm not sure that I believe it cuts as strongly in his way as he says it does. Yes, she was told that a warrant would be taken. But then the officers who were taking the warrant went out and they took, they stood, not blocking the door, away from the interrogation and videotaped the interview. Now, the defendant says, well, the videotape, that's an indication that she would have not voluntarily consented, that she was in custody, that she was not. Well, I would say that's not true. Wasn't the fact that there were four officers there, didn't that in and of itself convert that hospital room from a neutral setting to a setting more like a police station? No, not in and of itself. There are, again, there are six factors. The trial judge actually listed a couple more, which I think are sub-factors, but six factors that I don't believe we disagree on, taken from an Illinois Supreme Court case, and I would argue that three of the factors clearly cut in the way of the state. The first one, the location, time, length, mood, and mode of questioning. It was at the hospital, what is normally a neutral area. It was not as long as 45 minutes, the mood and the mode of the questioning. And please, I can't emphasize this enough. As the trial judge noted, he had looked at the video several times, and indeed he said, I think it's at page four of his opinion, which starts at 122 of the common law. I can't give you the common law site, but it's at page four of that 16 or 17-page written opinion. He found that it was a low-key, non-coercive interrogation. So I think factor one clearly cuts for the state. Factor four, there were no indicia of formal arrest. The officers didn't even have uniforms on. One had a polo shirt with an emblem on it. There were no guns shown or anything like that. There was no fingerprinting. She was never handcuffed. Five, again, the mannered defendant arrived at the location. The officers did not take her there. And it's a minor factor, but just to be clear, only the two doing the technical stuff were officers. The woman who asked a few questions towards the end was, I believe, a DCFS worker. And the main questioner, interrogator, Mr. Hultman, I guess his name is, was, I believe, a state's attorney's investigator. So it explains why there weren't uniforms. But, again, the manner she arrived there was not that way either. The presence or absence of family friends is a factor. However, it's important to note that the officers did not shunt any family friends away, did not say, we have to talk to this person. They have to take the defendant as they found her, and they did. So I don't think that factor is very strong against the state, if it is at all, because there was no indication that they secluded her. Also, the fifth factor, the manner, I'm sorry, the sixth factor, the age, intelligence, and mental makeup of the accused. Again, as Justice Burke has noted, the trial judge twice noted, both with regard to the September, I'm sorry, July 7th and July 13th arguments, the interrogations, that he had taken into consideration both the videotapes and the testimony of both the people's experts and the defendant's experts, and found that, indeed, she was capable and did voluntarily waive. So, also, the defendant's expert said she had an IQ of 79, but recognized that an IQ of 79 is perfectly capable and functional. Also, there's evidence that the defendant lied. She said she can't read or write, and yet she was shown writing letters to her boyfriend. And there was evidence that the defendant played cards and other games. So it's not a case where this IQ of 79 makes her totally incapable. Well, she had just had a psychotic break the night before, correct? Yes, she had, and the doctor and the people's experts both referred to that as an acute circumstance. With regard to that, Your Honor, and the held- Does that mean it's all gone in the morning? I think it means it's all gone if you look at, again, look at the video, and you'll see that there's no indication of hallucinations, of bizarre behavior, or force, or lack of understanding of what's going on. And this was also testified to by Dr. I think his name was Wasilu, W-A-S-Y-L-I-W. I'm not sure how to pronounce it. He said he looked at the video. He consulted with two psychiatrists who also looked at the video. They found both that she was of high or that she was of normal intelligence, but more importantly, they found that there were no residual effects of that psychotic episode. Also, there was evidence from the treating psychiatrist who said that after the HALDOL, there were no bizarre hallucinations. She seemed calm and coherent. There were nurses' records saying she was checked at 1 o'clock, checked at 2.55, and checked at 8 o'clock after the interview each time she was calm and cooperative. You know, the defense relies on people versus brags. That talks about the vulnerability of the defendant. Don't you-I mean, how do you convince us that this particular defendant, who was of low intelligence, or even if you say of average intelligence, she's not English-speaking, she just had a breakdown, she just lost her child, and she was on HALDOL. How was she not vulnerable when these police officers walked in at 5 o'clock in the morning with a search warrant and, again, setting up video equipment and questioning her? Two, maybe three answers to that. That, of course, is Justice Kennedy's test under Siebert. We don't get to Siebert if there's no custody. Remember that. Even if we do, then we're talking about whether or not there was this question first, Mirandai second. I think the facts here clearly show that that was not the situation. What did the interrogator do when he first walked in? The very first thing he did before he went into the room where the defendant was was ask the charge nurse, is she calm and coherent? Can she make intelligent decisions? The charge nurse said yes. He then went in, told her we're here for two reasons. We have a search warrant, and also we want to talk to you about what happened. The defendant then starts saying something about Evelyn. As soon as she gets that word out, the investigator says, wait, I need to tell you you do not have to talk with us. Clearly, and indeed, if you look at that interview, I counted, I think, seven times throughout that interview that he tells her over and over again, you don't have to talk with us. And at one point in time, she said she didn't want to talk with him. Yes, and he then immediately said, well, okay, that's all right, but we need to find things out. We want to investigate. And she did not persist. She said, yeah, that's okay. And she said, indeed, at the very beginning, he said, no, it's okay. And she said, no, I want to talk to you. I want to tell you what happened. She reiterates that throughout. And at the end of that, and at the end of the July 13th, the investigator goes through with her and says, no, I read you these rights, correct? You understood them, correct? You wanted to talk with us, correct? We did not coerce you or threaten you, correct? And both times she says yes. I mean, the record's quite clear, both the written record and, again, view the video, and you can see how coherent and aware this woman was and how calm and low-key the investigation was. With regard to the Haldol, one more thing. I cited two cases besides the testimony of the experts. Wait one second. Did he also tell her that if she talked to them and told them the truth, everything could be fixed? Didn't he tell her that, too? He spoke to her and said that we needed to know the truth so that things could be fixed. And then he also acknowledged that that may have been a poor choice of words, right? Yeah, it might, again, be a poor choice of words, but that doesn't indicate that she didn't voluntarily surrender the rights and that she didn't know. Again, she was told multiple times she didn't have to talk with them. With regard to the Haldol, and in addition to the clear evidence here, I cited in the brief, and I just want to note again, People v. Kincaid, which is an Illinois Supreme Court opinion from 1981, and People v. Madden, which is a First District opinion from 1986. In Kincaid, a defendant's statement was found voluntary, although he was questioned two hours after taking Haldol because of a suicide attempt. In Madden, the defendant's statement was found voluntary, although he had an IQ of 82 and was questioned, and I don't have the time on this, but was questioned after being given Haldol for two suicide attempts. So, yeah, while it's a factor, it certainly is not, well, she was given Haldol, therefore she certainly couldn't be, the record clearly shows that the trial judge here made accurate factual findings and accurate legal findings. Is there a certain nullification of brand warnings when they're accompanied with the admonishment that they mean nothing? No, Your Honor, certainly that's a factor. Arguably, that's, it was, again, a poor choice of words. But if you look at what he said there, he began it by saying, well, Was this at the second interview? This was at the second interview, and he began it by referring to first interview, saying, Oh, listen, do you remember that I read you these things before? I assume they continue. I read you these things before, and it means nothing. Perhaps nothing more, nothing different. But more importantly, he then goes on point by point to click through the Mirandas, as he did the first time, and have her sign the waiver. In that regard, Your Honor, to the extent that it's a factor, the people don't believe it's strong, and it's certainly overcome by the several other factors here. No other questions? We ask this Court to affirm the defendant's convictions. Well, she could have taken it to mean that it didn't mean anything then and it doesn't mean anything now, right? I mean, when he said it, the Miranda rights, it doesn't mean anything. I think that's what he told her before reading it. Yes, Your Honor, but I think any inference in that direction is defeated by, again, the fact that he goes over the Mirandas specifically, and the fact that they can go over before, and the fact that she'd been explained to several times the first time, and she repeatedly said, no, I want to talk, I want to understand. So she's been advised several times. Anything else? We have nothing with this. Thank you, Your Honor. Thank you, Counselor. Mr. Miller? Your Honor, just regarding the delay in giving the Miranda warrant insight, the quote from, I believe it's Montgomery, is, rarely, if ever, a legitimate reason to delay giving a Miranda warning until after the defendant has confessed. Instead, the most plausible reason for delay is an illegitimate one, which is the interrogator's desire to weaken the warning's effectiveness. I mean, I think the evidence is really overwhelming that that's exactly what's going on here. There's this example after example of the investigator trying to manipulate, either weakening Miranda or saying they're not important, and giving the manner when they come after she's just learned her child died, having a psychotic breakdown, suicide attempt, coming in with a warrant and not executing it. This officer, he's been an officer since 1979. He knew what he was doing. And the argument is not that the list of what makes factors what someone's in custody or is not. That is not just, well, you meet factor one and two and three, but not four and six or whatever. The ultimate point is to determine whether a reasonable person would feel that they're free to leave. And I think the evidence is clear that a reasonable person in Ms. Beltran's situation would not have felt free to leave given all of the factors. The State also did bring up the prosecutorial misconduct, so I think I'll touch on that briefly. I don't think there's really any question that the State used a strategy because the child happened to have died wearing a shirt that said heavenly angel to essentially make its theme of not only its main closing argument but its rebuttal closing argument that the child is a heavenly angel no longer with us. So do you think that meant the jury believed that literally? Of course not, but the purpose of this and the sole purpose of this could only have been to inflame the passions of the jury to get them highly emotional and to want to convict whoever happens to be sitting in the defendant's chair. Are you saying that the facts as they were presented in this case were not emotional to begin with? That it is a five-year-old child? Sure, which is all the more reason not to be intentionally inflaming the passions. So are you saying that where do you believe then the line should have been drawn by the prosecutors? They should not have been permitted to use the T-shirt and hold it up? Or they should have held it up and not read what was on the front of it? Where does the law say you draw the line? The law says you draw the line on what's relevant. And it was not relevant as to what the T-shirt said, is that what you're saying? Absolutely not. If it were to say little devil, would that have meant she was a little devil? Presumably they probably would have said, oh, little devil, that's what the parents thought she was a little devil. So that would have been okay or not okay? No, it's completely irrelevant. Well, it depends on whether it's inflaming the passions of the jury or not. I mean, if you argue something's irrelevant, it doesn't matter. But you say because it was repetitive. Yeah, it was repetitive, it was pervasive, and it's clearly they did it not only during the main argument. They did it during the rebuttal where the prosecutor talked about, I believe he likened this case to a video about angels taken too soon. And it was just a theme throughout their whole closing argument of trying to tie this to an angel. And it's highly improper. And that goes to the crime. And, yeah, defense counsel objected and noted that the prosecutor was crying during the closing argument. And I have cited a case that says that that's improper. But you look at the reason that that's improper, and the reason that's improper is because when you're crying, when a prosecutor's crying, that conveys to the jury. That makes it even more emotional, and it's going to make it more likely the jury's going to judge the case on emotion rather than on the evidence. Well, do you agree with counsel that if she really were crying, that the trial judge would have made that part of the record and didn't? No, quite frankly. I mean, she could have been crying, perhaps the judge only noticed. So the judge just skipped it? No. The judge said highly emotional. And quite frankly, I don't see that it really matters whether she was actually shedding a tear or whether she was speaking in a highly emotional voice. The point is that if you're speaking in a highly emotional voice, that is, once again, just like the angel, to get the jury emotionally charged and to want to convict whoever is sitting in that chair. And I think that's what makes the argument improper. But the improper argument rises to the level of reversible error when it plays a material part in the defendant's conviction. I mean, if we were to affirm on the first ground that you raised and these statements were admissible, I mean, we have the menace's testimony that she was beating this child. We have the defendant's confession that she committed this crime. Does this crying and improper argument really play a material part? Your Honor, I guess two responses to that. First of all, there's plain error if it threatens the integrity of the judicial process. And even if you were to assume that the evidence is overwhelming, that doesn't give the prosecution just a license to go off on the defendant. That's number one. And number two, the evidence is not overwhelming. And I understand that, you know, the situation I'm in now, I can't be arguing that the jury could disregard, you know, there was error for the jury to do what it did. But going back at the time of the trial, there was a very real argument to be made that Victor was the one who actually beat this child and not Christina, and that she was making the story up to accept responsibility to save her twins and to keep her twins in custody because she was fearful that the state was going to take them. They did make that argument, correct? Yes. But what I'm saying is, yeah, that was up for the jury to believe, and that's why I'm not raising the reasonable doubt argument. But that was up to the jury, and that's up to the jury without inflammatory improper argument from the state, repeated intentional inflammatory argument. And it's a little difficult for us, counsel, because isn't the trial court in a superior position to assess all of these things that you're asking us now to assess from a record, i.e., the tone of voice, you know, the credibility of the psychologist or psychiatrist? I mean, you're asking us to reassess this credibility when the trial court is in a far superior position. Well, I don't believe I'm asking you to reassess credibility. Most of the factors that I pointed to are really not even disputed. You know, it's not disputed that they came in with a warrant and then didn't execute it later. It's not disputed that she had a mental breakdown. It's not disputed that she committed suicide. It's not disputed that she was injected with Haldol. It's not disputed that four officers entered. You know, the great majority of these things are not disputed. And so for these reasons, I'd ask that Your Honors reverse the spell chance conviction and let her have a new fair trial. Thank you. Thank you. Thank you. At this time, the court will take the matter under advisement and render a decision in due course. Court stands.